**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DENISE M. NEWCOMER,

                                        Plaintiff,

        - v -                                                        No. 05-CV-1606
                                                                          (NAM/DRH)

MICHAEL J. ASTRUE, Commissioner of
Social Security,[1]

                                        Defendant.

**APPEARANCES:**                              **OF COUNSEL:**

HINMAN, HOWARD, & KATTELL, LLP          EUGENE D. FAUGHNAN, ESQ.
Attorney for Plaintiff
Post Office Box 5250
700 Security Mutual Building
80 Exchange Street
Binghamton, New York 13902-5250

HON. GLENN T. SUDDABY                     WILLIAM H. PEASE, ESQ.
United States Attorney for the            Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER[2]**

        Plaintiff Denise Newcomer ("Newcomer") brought this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

─────────────────────

        [1]Michael J. Astrue became Commissioner of Social Security on February 12, 2007.
Pursuant to Fed. R. Civ. P. 25(d)(1), he is substituted as defendant.

        [2]The matter was referred to the undersigned for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Newcomer moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings.  Docket Nos. 5, 12.  For the reasons which follow, it is recommended that the Commissioner's decision be remanded for further proceedings.

## I. Procedural History

On June 27, 2003, Newcomer filed for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 et seq.  T. 90-92.[3]  The application was denied after the initial determination.  Tr. at 63, 65-68.  Newcomer requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Larry K. Banks on July 1, 2005.  T. 69, 29-62.  In a decision dated July 25, 2005, the ALJ held that Newcomer was not entitled to disability benefits.  T. 18-26.  Newcomer filed a request for review with the Appeals Council.  T.9-14.  On November 10, 2005, the Appeals Council denied Newcomer's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 4-6.  This action followed.

## II. Contentions

Newcomer contends that the ALJ erred when he failed properly to apply the treating physician's rule, evaluate her subjective complaints of pain, determine her residual functional capacity (RFC), and satisfy his burden that significant jobs in the national economy existed that she could perform.  The Commissioner contends that there was substantial evidence to support the determination that Newcomer was not disabled.

---

[3]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 4.

### III.  Facts

Newcomer is currently thirty-nine years old and received a General Educational Development ("GED") diploma.[4]  T. 32-33, 90, 104.  Newcomer previously worked as a grocery clerk, merchandiser, manager for a rental business, line worker, secretary, kitchen worker, and developmental assistant.  T. 34-38, 99.  Newcomer alleges that she became disabled on January 14, 2002 due to lower back pain and depression.  T. 38-42, 98.

### IV.  Standard of Review

### A.  Disability Criteria

A claimant seeking disability benefits must establish that "he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A) (2003).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] w

Id. at §§ 423(d)(2)(A) & 1382c(a)(3)(B) (2003).

The Commissioner uses a five step process, set forth in 20 C.F.R. §§ 404.1520 & 416.920, to evaluate disability insurance benefits and SSI claims:

> First, the [Commissioner] considers whether the claimant is currently engaged

_____

[4]Newcomer also completed one-half year of college.  T. 33.

in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. §§ 404.1520 & 416.920 (2003).

A plaintiff has the burden of establishing disability at the first four steps.  Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  However, if the plaintiff establishes that an impairment prevents him or her from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform.  Id.

**B.  Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Shaw, 221 F.3d at 131 (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197,

*-4-*

229 (1938)); see Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Prentice v. Apfel, No. 96 Civ. 851(RSP), 1998 WL 166849, at *3 (N.D.N.Y. Apr. 8, 1998) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). A court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

## V.  Discussion

### A.  Medical Evidence

#### 1.  Physical Condition

Newcomer alleges that she became disabled on January 14, 2002 when, while lifting a sleeper sectional couch during her work hours, she heard a pop in her back.[5]  T. 38.  On March 14, 2002, Newcomer began seeing Dr. Ruth Crepet, her treating physician, for her workers' compensation case.  T. 279-81.[6]  Dr. Crepet noted that Newcomer was in distress and that she stood awkwardly.  T. 280.  She found that Newcomer had a reduced lordotic curve, there was bilateral paraspinal muscle firmness, flexion was limited, and she

_____

[5]Newcomer stated that a few days after the injury, she went to the emergency room. See T. 279.  However, there are no medical records regarding a hospital visit for that time.

[6]Newcomer testified that she currently receives money from workers' compensation. T. 38-39.

could not walk on heals or toes.  Id.  Dr. Crepet prescribed Vioxx, Flexeril, and Darvocet. T. 281.  On April 2, 2002, a Magnetic Resonance Imaging (MRI) was taken of Newcomer's back.  T. 158.  The MRI revealed multilevel degenerative change and disc herniation with the largest at the L5-S1 level and the second at the L4-5 level.  T. 158-59.  The MRI also revealed that the vertebral body heights were maintained.  T. 158.  On April 10, 2002, Dr. Crepet stated that Newcomer was prohibited from working due to back pain and L4-L5 radiculopathy.  T. 276.  Newcomer was referred to a neurosurgeon, Dr. Levitt.  Id.

On June 27, 2002, Newcomer underwent lumbar surgery, which was performed by Dr. Levitt.  See T. 155.  Thereafter, on December 17, 2002, Dr. Crepet stated that Newcomer was in no acute distress, her back was nontender to palpation, flexion was limited, the strength on her right leg was 4/5 but 5/5 on the left, and there was decreased ankle reflex of the right leg although it was intact on the left.  T. 157.

On February 26, 2003, Newcomer described to Dr. Crepet that she was working at a grocery store and needed the lifting restriction of up to ten pounds to be increased to fifteen-to-twenty pounds.  T. 155.  Dr. Crepet examined Newcomer and opined that she was able to sit without difficulty; posture, station, and gait were unremarkable; there was no tenderness to palpation over the spine or paraspinal muscles; and strength in the right thigh was 4/5, and the lateral part of the right foot was numb.  T. 156.  Based on the examination, the lifting restriction was increased to twenty pounds.  Id.  On April 28, 2003, Dr. Crepet stated that Newcomer could sit without difficulty, flexion was 80°, there was no tenderness of the sacroiliac joint, she could heel and toe walk, and pinprick was diminished in the right outer leg though it was intact on the left.  T. 154.  Vioxx was prescribed.  Id.

-6-

On May 28, 2003, Dr. Crepet found that Newcomer could sit and stand without difficulty, she had a normal lordotic curve, and she could walk on her heels and toes.  T. 153.  She noted, however, that there was diffuse tenderness and flexion and extension were limited.  Id.  However, Newcomer stated that she did not wish to be on any medications so therapy was recommended.  Id.  On June 23, 2003, Dr. Crepet stated that Newcomer could sit during the examination, her back had a normal curve, flexion and extension were limited, the back was nontender to palpation, there was no paraspinal firmness, and she could walk on her heels and toes but complained that her toes felt numb.  T. 151.  Dr. Crepet again recommended continued therapy and prescribed Skelaxin.  Id.  She further indicated that Newcomer could not find a job that was consistent with her work restrictions of no lifting more than five to ten pounds.  Id.

On September 16, 2003, Newcomer was consultatively examined by Dr. Ramon Medalle.  T. 200-04.  Dr. Medalle noted that Newcomer could shower and dress herself, occasionally cook and shop, and do light house cleaning and laundry with help.  T. 201.  Dr. Medalle found that Newcomer's gait was abnormal, she was dragging her right foot slightly, she could heel-walk with difficulty, she could not walk on her toes, and she was using a right ankle brace.  T. 202.  Dr. Medalle noted, however, that her squat was full, she needed no help getting on and off the examination table, and she was able to rise from a chair without difficulty.  Id.  Dr. Medalle also stated that Newcomer's cervical spine showed full flexion, extension, lateral flexion, and rotary movement bilaterally and she had full range of motion in her shoulders, elbows, forearms, wrists, hips, and knees.  T. 202-03.  While there was full range of motion of the left ankle and strength was 5/5 in the proximal and distal muscles bilaterally, there was absent pinprick and light touch over the

right thigh, leg, and foot that corresponded to the L5 and S1 nerves.  T. 203.  As to the thoracic and lumbar spines, Dr. Medalle opined that flexion, lateral flexion, and rotation were limited bilaterally but there was no spinal or paraspinal tenderness, SI joint or sciatic notch tenderness, spasm, or scoliosis.  T. 202-03.  Dr. Medalle reported that Newcomer should avoid smoke, dust, and other pulmonary irritants due to asthma and that she was moderately limited in activities involving bending, lifting, walking, and prolonged sitting and standing.  T. 203.

On September 24, 2003, a state agency consultant completed a physical RFC assessment.  T. 214-19.  It was opined that Newcomer could frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, stand and walk for at least two hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  T. 215.  The consultant further stated that Newcomer could push and pull without unlimitation; occasionally climb, balance, and stoop; frequently kneel, crouch, and crawl; and that she should avoid concentrated exposure to fumes, odors, dust, and other respiratory irritants. T. 215-17.

From November 2003 until October 2004, Newcomer was primarily treated by Dr. Donna Ferrero with the University Orthopaedic Associates of Rochester.  See T. 242-44, 247-48, 250-51, 253-56, 258-60.  In November 2003, Dr. Ferrero noted that Newcomer could toe-walk but with a slight footdrop on right heel-walking, lumbar range of motion was limited, there was no significant tenderness to palpation, straight-leg raise on the left was negative but positive on the right, and there was diminished pinprick sensation on the right L5 dermatome.  T. 243.  Physical therapy was recommended and she was prescribed

Neurontin.  Id.[7]  In January 2004, Dr. Ferrero found that her lumbar flexion was improved, although extension was still restricted.  T. 258.  On March 26, 2004, Newcomer continued to have distal weakness on the right and it was further noted that reflexes were symmetrical in both knees but absent at the right heel.  T. 255.

In June 2004, Dr. David Speach, also with the University Orthopaedic Associates of Rochester, evaluated Newcomer.  T. 253-54.  He found that she had normal gait, weakness on the right ankle with normal strength on the left, reflexes were normal on the left, and straight-leg raises were normal on the left but positive on the right.  T. 253.  Dr. Speach referred her to a brace shop for her right foot.  Id.  On August 12, 2004, Dr. Ferrero reported that Newcomer had right distal weakness as compared to the left but that straight-leg raises were negative.  T. 250.  She stated that Newcomer had mild-to-moderate partial disability.  Id.  In October 2004, Dr. Ferrero found her examination to be unchanged but stated that an error was previously made in the severity of the disability and that she was at least moderately-to-markedly partially disabled.  T. 247.

From January through May, 2005, Newcomer was examined by Dr. Kathleen Hayden.[8]  T. 239, 241, 294-95.  On January 20, 2005, Dr. Hayden noted that Newcomer had limited range of motion, no tenderness to palpation, her patellar reflexes were normal and symmetrical, and she had decreased sensation and weakness along the right leg.  T. 241.  In March 2005, Dr. Hayden found that straight-leg raises were positive bilaterally and

---

[7]In December 2003, Dr. Ferrero noted that Newcomer's examination was essentially unchanged from that of November 2003.  T. 260.

[8]No examinations occurred in April or May 2005.  T. 294-95.  Furthermore, in March 2005, there are two medical records for the same day and in one, Dr. Hayden noted that there was no examination.  T. 239.

there was weakness on the right but patellar reflexes were normal and she had full range of motion.  T. 239.  On May 5, 2005, Dr. Hayden stated that an MRI taken in early 2005 showed enhanced epidural scarring causing moderate invasion of the foraminal fat and that an EMG study confirmed chronic S1 radiculopathy.  T. 234.  Dr. Hayden noted that Newcomer wore a brace on the right foot due to footdrop, that she was doing water-based therapy at the pain clinic, and she was taking Neurontin and Piroxicam.  Id.  Additionally, Dr. Hayden stated that Newcomer was diagnosed with bipolar disorder and taking Prozac. Id.  She concluded that Newcomer was markedly disabled due to the back pain as well as episodes of mania.  Id.

On May 26, 2005, Dr. Hayden completed a physical assessment of Newcomer's ability to do work-related activities.  T. 303-06.  She stated that Newcomer could lift and carry ten pounds, occasionally lift and carry less than ten pounds, and frequently lift and carry five pounds.  T. 303.  Dr. Hayden also opined that Newcomer could sit, stand, and walk for two hours in an eight-hour day but only for fifteen minutes without interruption.  T. 304.  She further reported that Newcomer could never climb, balance, stoop, crouch, or crawl and that she had difficulty reaching and pushing or pulling.  T. 304-05.

### 2.  Mental Condition

From February 3, 2003 until March 5, 2004, Newcomer was treated at Tompkins County Mental Health Services for her psychiatric problems.  See T. 173-92.  Upon the initial diagnostic assessment on February 3, 2003, Newcomer's prior hospitalizations due

to three suicide attempts[9] as well as past drug and alcohol abuse were noted.  T. 177-79.

The evaluator, Registered Nurse ("RN") Margrethe Termansen, also described the sexual

abuse suffered by Newcomer, her teenage pregnancy, her problems with her mother, and

her physically abusive relationships.  T. 179.  It was further noted that Newcomer had

been on Prozac for four or five years but stopped fearing she would become addicted.  Id.

RN Termansen stated that her mood was depressed; motor behavior, thought processes,

and memory were intact; and her judgment/insight was fair-to-good.  T. 180.  Newcomer

was diagnosed with major depression without psychotic features, polysubstance

dependency in full remission, post-traumatic stress disorder (PTSD), and personality

disorder.  Id. On September 4, 2003, Dr. John Bezirganian of Tompkins County Mental

Health Services opined that after more than a year of therapy and treatment with

medications, Newcomer had no psychiatric impairments that would affect her ability to

work.  T. 198.

On September 16, 2003, John Thomassen, Ph.D., conducted a consultative

psychiatric evaluation.  T. 205-09.  Dr. Thomassen stated that she was coherent and goal-

directed, her affect was flat, her mood was dysphoric,[10] her orientation, attention, and

concentration was intact, and her recent and remote memory skills were mostly intact.  T.

207.  He also found that her insight was fair and judgment was questionable.  T. 207-08.

He diagnosed her with major depression, recurrent, moderate, alcohol abuse, cocaine

---

[9]Newcomer was first hospitalized at the age of eleven for two years.  The last hospitalization occurred in 1998 for thirty days.  T. 177, 205.

[10]Dysphoria is "[a]n emotional state marked by anxiety, depression, and restlessness."  THE AM. HERITAGE MED. DICTIONARY 245 (Revised ed. 2007).

dependence in sustained remission, and borderline personality disorder.  T. 208.  Dr.
Thomassen concluded that Newcomer could perform rote tasks and follow simple
instructions but that she would have difficulties doing complex tasks, relating with co-
workers, and dealing with stress.  Id.

On September 24, 2003, state agency consultant Dr. M. Apacible completed a
mental RFC assessment.  T. 210-12.  Dr. Apacible examined twenty categories of mental
function including the major categories of:  (A) understanding and memory; (B) sustained
concentration and persistence; (C) social interaction; and (D) adaptation. (T. 180-81).  Of
the twenty functions examined, Dr. Apacible found that Newcomer had moderate
limitations in eight categories relating to the ability to understand, carry out, and remember
detailed instructions, working with others without being distracted, interacting appropriately
with the public, accepting instructions and responding appropriately to criticism by
supervisors, responding appropriately to changes in the workplace, and setting realistic
goals or making plans independent of others.  T. 210-11.  In all other categories, Dr.
Apacible found that Newcomer was not significantly limited.  Id.

Two days later, Dr. Apacible completed a Psychiatric Review Technique Form and
found that Newcomer had medically determinable impairments that did not satisfy the
diagnostic criteria.  T. 220-29.  Dr. Apacible stated that Newcomer had mild restrictions of
activities of daily living and difficulty in maintaining social functioning and moderate
difficulty in maintaining concentration, persistence, or pace.  T. 230.  However, there was
insufficient evidence to determine if Newcomer had repeated episodes of
decompensation.  Id.

On May 23, 2005, Michael Kuttner, Ph.D., completed a mental assessment of Newcomer's ability to do work-related activities.[11]  T. 288-90.  He found that her ability to: 1) follow work rules and maintain personal appearance was good; 2) deal with work stresses, function independently, understand, remember, and carry out complex, detailed and simple instructions, behave in an emotionally stable manner, relate in social situations, and demonstrate reliability was fair; and 3) relate to co-workers, deal with the public, use judgment, interact with supervisors, and maintain attention/concentration was seriously limited.  Id.  He also opined that Newcomer could manage benefits in her own best interest.  T. 290.

### B.  Treating Physician's Rule

Newcomer contends that the ALJ erred when he accorded the opinions of Drs. Hayden and Ferrero, her treating physicians, little weight.  The Commissioner contends that the ALJ properly weighted the opinions.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

---

[11]In March 2005, it was noted that Newcomer had only one visit with Dr. Kuttner up to that point.  T. 296.  There are no medical records for that one visit or any others after March 2005.

consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2003); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

### 1.  Dr. Hayden

In his decision, the ALJ reviewed Dr. Hayden's RFC assessment against her medical records and then assigned little weight to the assessment.  T. 22.  The ALJ found that Dr. Hayden's RFC assessment was inconsistent with records of treatment and the record as a whole.  T. 22.  The ALJ stated that Dr. Hayden only saw Newcomer on a limited number of occasions and in visits occurring in March, April, and May 2005, no examinations were performed.  Id.  The ALJ reported that within the evaluations conducted, Dr. Hayden found that Newcomer had full range of motion, weakness on the right toe dorsiflexion and plantar flexion, and varying tenderness to palpation.  Id.

In this case, as noted previously, the medical records establish that no examinations occurred in April or May, 2005.  T. 294-95; see supra note 8.  However, in March 2005, an examination took place relating to her physical condition but not her mental condition.  T. 239.  Notwithstanding, in the January 2005 examination, Dr. Hayden found that while Newcomer's range of motion was limited and there was weakness on the right toe as well as decreased sensation along the right thigh, her patellar reflexes were normal and symmetrical bilaterally and there was no tenderness to palpation.  T. 241.  On March 7, 2005, Dr. Hayden noted that there was paraspinal tenderness and weakness to dosiflexion and plantar flexion on the right.  T. 239.  Nevertheless, she also stated that patellar reflexes were normal and Newcomer had full range of motion.  Id.  Then, in April and May, 2005, Dr. Hayden stated that Newcomer was a "[h]ealthy appearing female adult."  T. 294-95.

While Dr. Hayden's findings regarding tenderness to palpation and weakness on the right side is corroborated by the record, the restrictive nature of her RFC assessment is not supported by her medical opinions nor the record as a whole.  During several examinations with Dr. Crepet, it was noted that Newcomer had no difficulty sitting and/or standing and she could heel-and-toe walk.  T. 151, 153-54, 156.  Dr. Crepet also found that her posture, station, and gait were unremarkable and that Newcomer's back had a normal curve.  T. 151, 153, 156.  Additionally, Dr. Speach reported that Newcomer had normal gait and normal strength on the left side.  T. 253.

Furthermore, in a consultative examination, Dr. Medalle indicated that Newcomer could shower and dress herself, occasionally cook and shop, and do light house cleaning and laundry with help.  T. 201.  Dr. Medalle then stated that her squat was full, she

needed no help getting on and off the examination table, and she was able to rise from a chair without difficulty.  Id.  Dr. Medalle further found that Newcomer's cervical spine showed full flexion, extension, lateral flexion, and rotary movement bilaterally, and she had full range of motion in her shoulders, elbows, forearms, wrists, hips, and knees.  T. 202-03.  There was also no spinal or paraspinal tenderness, SI joint or sciatic notch tender, spasm, or scoliosis in the lumbar or thoracic spines.  T. 202-03.

Based on these medical findings, Dr. Hayden's limited examinations, and the entire record, the ALJ did not err in according Dr. Hayden's opinion little weight.  The ALJ's determination is supported by substantial evidence in the record and it is recommended that it be affirmed.[12]

### 2.  Dr. Ferrero

The ALJ stated that because Dr. Ferrero did not provide any specific functional limitations and only indicated the degree of disability suffered by Newcomer, the opinion was entitled to little weight because it is an opinion reserved for the Commissioner.  T. 22.  The ALJ did not err in making that finding.

While Dr. Ferrero conducted several examinations from November 2003 until

---

[12]Notwithstanding the little weight assigned to Dr. Hayden's RFC assessment, the ALJ seems to have incorporated some of the restrictions indicated within the opinion.  Compare T. 21 with T. 22.  The ALJ gave great weight to Dr. Crepet's restriction of lifting five-to-ten pounds and such was also noted in Dr. Hayden's assessment that Newcomer could lift five pounds frequently and up to ten pounds.  T. 22.  Furthermore, the ALJ's sit-and-stand option of alternating every fifteen-to-thirty minutes is similar to Dr. Hayden's notation that Newcomer could sit, stand, or walk for fifteen minutes without interruption.  Compare T. 21 with T. 22.

October 2004, in none of those evaluations did she extrapolate upon any work-related restrictions or limitations.  Only in August 2004 did Dr. Ferrero state that Newcomer had a mild-to-moderate partial disability.  T. 250.  Then, two months later, Dr. Ferrero found her August 2004 examination to be unchanged but reported that Newcomer was at least moderately-to-markedly partially disabled.  T. 247.

Instead of assessing or describing any of Newcomer's functional limitations, Dr. Ferrero clearly drew a conclusion as to her disability without explanation.  As noted previously, the final determination of disability rests with the Commissioner.  Snell, 177 F.3d at 133-34; see 20 C.F.R. § 404.1527(e).  The ALJ did not discount the entirety of Dr. Ferrero's opinions but only that which stated the severity of Newcomer's disability.  The ALJ did not err on this account.  Accordingly, it is recommended that the Commissioner's decision regarding the weight of the opinion be affirmed.

## C. Subjective Complaints of Pain

Newcomer contends that the ALJ's decision not to credit fully her subjective complaints of disabling pain was in error.  The Commissioner asserts that Newcomer's credibility was properly assessed.

The basis for establishing disability includes subjective complaints of pain even where the pain is unsupported by clinical or medical findings provided that the underlying impairment can be "medically ascertained."  20 C.F.R. § 404.1529 (2005); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  A finding that a claimant suffered from disabling pain requires medical evidence of a condition that could reasonably produce such pain.  An ALJ must consider all symptoms, including pain, and the extent to which

these symptoms can reasonably be expected to be consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2005); Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  "The ALJ must discuss his resolution of the claimant's credibility regarding pain in a narrative discussion that provides specific reasons for the weight that he assigned to the claimant's statements; he may not merely conclude that the claimant's statements are not credible."  Lewis v. Apfel, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978); Lewis, 62 F. Supp. 2d at 653.  If there is conflicting evidence about a claimant's pain where the degree of pain complained of is not consistent with the impairment, the ALJ must make credibility findings.  Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983).  The ALJ must consider several factors pursuant to 20 C.F.R. § 404.1529(c)(3):

(I)  [The claimant's] daily activities;

(ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3) (2005).

Here, the ALJ concluded that Newcomer's allegations of disabling symptoms and limitations were not entirely credible. T. 22. In support of his conclusion, the ALJ noted that even though Newcomer claimed she was totally disabled in January 2002, she applied to college and moved to Rochester in 2003. Id. He also stated that Newcomer testified that she could not sit for more than fifteen minutes but then reported that she went outside everyday and traveled by either driving or riding in a car and that she had planned to visit her grandparents in Iowa when she could afford the trip. Id. The ALJ further noted that Newcomer worked part-time with no complaints in May 2004. Id.

However, the ALJ's reliance on Newcomer's application to college and move to Rochester as reasons to discredit her allegations about the persistence, intensity, and limiting effects of her symptoms is befuddling. Newcomer testified that she was unable to continue with her college education due to mental health problems. T. 34. Newcomer's mental problems and accompanying limitations are well documented and would support her statement. See subsection V(A)(2). Furthermore, the ALJ did not question the veracity of her response nor probe any further. See T. 34.

As to the move to Rochester, the topic was barely touched upon at the hearing.

The only mention of it related to the mental health treatment Newcomer was receiving from the time she lived in Ithaca, New York,[13] to the move to Rochester, New York.  See T. 48-49.  The ALJ did not pose any questions as to why Newcomer made the move nor if she did something during the move that would call into question her limitations.  There is no information in the record presented that would discredit her allegations simply because she moved from one city to another.[14]

Although the ALJ's reference to discrepancies between Newcomer's testimony about her ability to sit in relation to how much she drove is corroborated by evidence in the record, see T. 151, 153-54, 156, 205, this does not cure the ALJ's errors.  The ALJ states that Newcomer had no complaints with her part-time job in May 2004.  However, medical notes from Newcomer's psychiatric treatment confirm that she was working at the part-time job in March 2004, not May 2004.  T. 173.  Notwithstanding, this seems to conflict with the bulk of the medical records and Newcomer's own testimony about when she ceased working.  Newcomer testified that she stopped working in March 2003.  T. 34. Newcomer's unemployment as of that approximate date was reflected in records from Drs. Crepet, Medalle, Thomassen, and Ferrero as well as in notes from the pain clinic.  T. 154, 202, 205, 237, 243, 282.  The ALJ seems to have overlooked the overwhelming evidence that contradicts his finding in this regard.  Moreover, Newcomer left her job in March 2003 because her place of employment could not accommodate her work-related restrictions.

---

[13]Tompkins County Mental Health Services, where Newcomer was treated from February 2003 until March 2004, was located in Ithaca, New York.  See T. 177.

[14]Based on the medical records, it seems that Newcomer made the move to live with her boyfriend.  See T. 205.

*-20-*

T. 154.

The ALJ further compounded his errors by failing to examine fully the remaining factors set forth in 20 C.F.R. § 404.1529(c)(3).  The ALJ did not describe Newcomer's daily activities; the location, duration, and frequency of her pain and other symptoms; the medications she was taking or their effects; the treatment she underwent to relieve her pain; the measures she took to alleviate her pain and other symptoms; or any other factors concerning her functional limitations.[15]

Based on the plethora of errors that occurred in assessing Newcomer's credibility, remand is recommend.

### D.  RFC

Newcomer contends that based on Dr. Crepet's restriction of lifting no more than five-to-ten pounds and the ALJ's description of her sitting, standing, and walking option, she did not retain the RFC to do sedentary work.  Newcomer further asserts that the ALJ failed to acknowledge her mental limitations in determining her RFC.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone, 70 F. Supp. 2d at 150; see 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations."  Smith v.

---

[15]Newcomer also claims that in assessing credibility, she clearly had non-exertional impairments.  Docket No. 5 at 15.  However, the ALJ does hold otherwise.  It is for precisely this reason that the ALJ employed the testimony of a vocational expert ("VE") instead of relying solely on the Medical Vocational Guidelines.  See T. 23-24.

Apfel, 69 F. Supp. 2d 370, 378 (N.D.N.Y. 1999) (citation omitted).  In assessing RFC, the

ALJ must make findings specifying what functions the claimant is capable of performing,

not simply making conclusory statements regarding a claimant's capabilities.  Martone, 70

F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his

or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910,

913 (2d Cir. 1990); see 20 C.F.R. § § 404.1545, 416.960 (2003).

Here, the ALJ found that Newcomer could perform sedentary work with a sit/stand

option that she would stand/walk for fifteen-to-thirty minutes before alternating to sitting for

fifteen-to-thirty minutes.  T. 21.  The ALJ stated that Newcomer could not climb any ropes,

ladders, or scaffolds and that she should avoid concentrated exposure to environmental

pollutants.  Id.  Additionally, the ALJ noted that because of moderate difficulties in social

functioning and in concentration, persistence, and pace, Newcomer was limited to

performing simple, routine, unskilled tasks involving no more than occasional contact with

co-workers, supervisors, or the general public.  Id.

Newcomer claims, however, that in finding that Newcomer could do sedentary

work, Dr. Crepet's June 23, 2003 restriction of lifting no more than five-to-ten pounds

precluded her from doing sedentary work.  Sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves
> sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).

In this case, the sole ability to lift five-to-ten pounds does not erode the base as to

render the RFC finding in error.  If Newcomer were able to carry no more than one or two pounds, then the unskilled sedentary occupational base would be significantly eroded. See Social Security Ruling ("S.S.R.") 96-9p, 1996 WL 374185, at *6, Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work (S.S.A. 1996).  However, this is not the case here.

Back in February 2003, Newcomer requested that the lifting restriction of up to ten pounds be increased to fifteen-to-twenty pounds.  T. 155.  After examining Newcomer, Dr. Crepet increased the lifting restriction to twenty pounds.  Id.  Two months later, in April 2003, Newcomer was still willing to work with a fifteen pound lifting restriction, but her job was unable to accommodate the limitation.  T. 154.  Then, in June 2003, it was noted in Newcomer's past medical history that she could not find work that would accommodate a restriction of lifting no more than five-to-ten pounds.  T. 151.  Nevertheless, both the state agency consultant and Dr. Hayden found that Newcomer could lift ten pounds.  T. 215, 303.  Newcomer also testified that she was able to carry a gallon of milk, which equates to approximately 8.5 pounds.[16]  This would be comparable to the ability to lift or carry occasionally articles like docket files, ledgers, and small tools.

Notwithstanding, Social Security Ruling 96-9p states that if Newcomer could lift or carry an amount between one or two pounds and ten pounds, which was the case here, consultation with a vocational expert would be appropriate to determine if jobs would be available in the national economy that Newcomer could perform.  S.S.R. 96-9p, 1996 WL

---

[16]See Wiki Answers, http://wiki.answers.com/Q/How_much_does_a_gallon_ of_milk_weigh (last visited Dec. 19, 2007).

374185, at *6.  Here, although the ALJ properly employed the testimony of a vocational expert, Dr. Peter Manzi, the ALJ failed to specify that Newcomer could lift between five and ten pounds.  See T. 52-54.  Instead, the ALJ merely stated that the vocational expert should consider someone with the ability to do sedentary work along with the further physical and mental restrictions previously indicated.  See id.  Thus, it is difficult to discern whether jobs existed in the national economy that could be performed with a limited ability to lift and carry objects.  See T. 52-54.[17]

As to the ALJ's finding that Newcomer should alternate between standing, walking, and sitting, such could erode the unskilled sedentary base.  S.S.R. 96-9p, 1996 WL 374185, at *7.  Nevertheless, in such circumstances, consultation with a vocational resource is recommended "in order to determine whether the individual is able to make an adjustment to other work."  Id.  In this case, the vocational expert was told of the limitation of standing or walking for no more than fifteen–to-thirty minutes before alternating to sitting fifteen-to-thirty minutes.  T. 52-54.  However, it is unclear whether the vocational expert would have come to the same conclusion that there were jobs within the national economy that Newcomer could perform with this restriction if he had been properly provided with Newcomer's lifting and carrying limitations.  Id.

Further compounding the ALJ's error was his failure to do a function-by-function assessment.  Under Step Four, an "RFC assessment must first identify the individual's

───────────────────

[17]Newcomer additionally argues that the treating physician's rule was violated as to Dr. Crepet here.  Docket No. 5 at 14.  However, her contention is that Dr. Crepet's opinion about Newcomer's ability to lift between five and ten pounds demonstrates that she cannot do sedentary work, not that the ALJ's determination to accord the opinion great weight was in error.  Id.  Thus, there was no need to address the issue.

functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. § 404.1545 and § 416.945.  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  S.S.R. 96-8p, 1996 WL 374184, at *1-2, Titles II and XVI:  Assessing Residual Functional Capacity in Initial Claims (S.S.A. 1996); see also Mardukhayev v. Comm'r of Soc. Sec., No. 01-CV-1324 (JG), 2002 WL 603041, at *5 (E.D.N.Y. Mar. 29, 2002).  As stated in Social Security Ruling 96-8p,

> RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy.  However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.

S.S.R. 96-8p, 1996 WL 374184, at *3.  Furthermore, the RFC assessment must address an "individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."[18]  Id. at *1.

In this case, the ALJ erred in determining that Newcomer could do sedentary work before assessing her work-related abilities on a function-by-function basis.  See T. 21.  The ALJ failed to specify the amount of pounds she could lift and carry as well as the total amount of time she could sit, stand, and walk in an eight-hour workday.  Although the ability to do sedentary work necessarily implies the most a claimant can do despite her

---

[18]A "'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. 96-8p, 1996 WL 374184, at *1.

limitations, such does not absolve the ALJ from his duty to outline, function-by-function, Newcomer's restrictions in her ability to do work-related activities and whether she had the capacity to work on a regular and continuing basis.  See Brown v. Barnhart, No. 01-CV-2962(JG), 2002 WL 603044, at *5-7 (E.D.N.Y. Apr. 15, 2002).[19]

Unlike the physical impairments, however, it is clear from the ALJ's RFC determination that he took into account Newcomer's mental impairments.  In finding that she had moderate difficulties in social functioning and concentration, persistence, and pace, the ALJ restricted her to performing simple, routine, unskilled tasks involving no more than occasional contact with co-workers, supervisors, and the general public.  T. 22. These restrictions do not erode the base and the medical records support the ALJ's decision in this area.  See S.S.R. 96-9p, 1996 WL 374185, at *9.

Dr. Bezirganian, who treated Newcomer from February 2003 until March 2004 at Tompkins County Mental Health Services, opined that she had no psychiatric impairments that would inhibit her ability to work.  See T. 173-92, 198.  Dr. Thomassen, the consultative examiner, found that she was coherent and goal-directed; her orientation, attention, and concentration were intact; and her insight was fair.  T. 207-08.  He concluded that Newcomer could perform rote tasks and follow simple instructions but that she would have difficulties doing complex tasks, relating with co-workers, and dealing with stress, which the ALJ considered in rendering the mental limitations.  Id.  Dr. Apacible, another state agency consultant, reported that Newcomer only had mild difficulty with

_____

[19]Although the ALJ found that Newcomer could not perform her past relevant work based on the RFC determination, the ALJ's failure to articulate all of her limitations may impact the Step Five evaluation.

social functioning and also found that she did not have any significant limitations in performing rote tasks and following simple instructions.  T. 210-11, 230.  Dr. Kuttner further stated that Newcomer's ability to follow work rules was good and her ability to deal with work stresses; function independently; understand, remember, and carry out complex, detailed and simple instructions; behave in an emotionally stable manner; relate in social situations; and demonstrate reliability was fair.

Thus, even though the ALJ correctly assessed Newcomer's mental limitations, the ALJ failed to assess her physical restrictions properly.  Accordingly, the ALJ failed to evaluate Newcomer's RFC  properly, remand is recommended.

### E.  Vocational Expert Testimony

Intertwined with Newcomer's argument regarding her RFC is her contention that the ALJ posed an improper hypothetical question to the vocational expert.

When the testimony of a vocational expert is utilized, as here, the ALJ must pose a hypothetical question that incorporates all of a claimant's impairments.  Juleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992) for the proposition that "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments").  If the ALJ fails to pose hypothetical questions that do "not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability."  Id. (citing Morse v. Shalala, 16 F.3d. 865, 874 (8th Cir. 1994)).

In this case, the ALJ's hypothetical questions to the vocational expert failed adequately to present all of Newcomer's functional limitations.  The ALJ posed three separate hypothetical questions to the vocational expert taking into account Newcomer's age, education, and past work experience.  In the first, the vocational expert was asked to assume that a person could perform no more than light exertional activity and that there needed to be a sit/stand option where the person would stand/walk for fifteen-to-thirty minutes before alternating to sit for fifteen-to-thirty minutes.  T. 52.  The vocational expert was further asked to assume that a person could not climb any ropes, ladders, or scaffolds; concentrated exposure to environmental pollutants should be avoided; and because of moderate difficulties in social functioning and in concentration, persistence, and pace, the person was limited to performing simple, routine, unskilled tasks involving no more than occasional contact with co-workers, supervisors, or the general public.  Id.

In the second hypothetical, the ALJ asked the vocational expert to assume that someone could do sedentary work and then again assume the same further restrictions as noted above.  T. 53-54.  In the third hypothetical, the ALJ asked the vocational expert whether, assuming Newcomer's testimony with regard to her needs, side effects of medication, and requirement to lay and rest most of the day, for at least two or more hours in a workday was supported by the record, could a person perform the jobs identified.  T. 54.

The ALJ questioned the vocational expert about a person's ability to do light work even though the ALJ found that Newcomer had the RFC to do sedentary work.  It is of no consequence here, however, because the hypotheticals posed failed to incorporate a specific limitation in Newcomer's ability to lift and carry and did not describe how many

total hours she could sit, stand, or walk in an eight-hour workday, apart from noting the sit-and-stand option.  Thus, the ALJ erred in presenting his hypothetical questions to the vocational expert due to the failure to provide the expert with all of Newcomer's functional limitations.

Remand is recommended herein with regard to the ALJ's finding as to Newcomer's RFC because the ALJ failed to describe her limitations on a function-by-function basis. Given that recommendation, it follows that the hypothetical questions posed to the vocational expert were also in error and, therefore, remand would also be appropriate to determine the availability of jobs in the national and regional economies based on revised RFC limitations.

## VI.  Remand or Reversal

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, there are gaps in the record and the evidence requires further development.  Accordingly, it is recommended that the decision of the Commissioner be remanded for further proceedings rather than reversed.

## VII.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **REMANDED** for further proceedings as described above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Date:   February 13, 2008
         Albany, New York

_____
United States Magistrate Judge